Next case is U.S. v. Medina Good morning. You may have pleased the court. My name is Ryan Akin. I represent the appellant Miguel Medina. I'd like to reserve two minutes for rebuttal. Medina was wrongfully convicted of transporting illegal aliens. He cannot be guilty under a direct theory of liability because he did not physically move or transport anyone but was at all times a passenger in a vehicle operated exclusively by his co-defendant, Leslie Rivera. He cannot be guilty under an aiding and abetting theory either because the evidence at trial was insufficient to prove that he knew in advance that the purpose of the trip was to transport illegal aliens. Whatever Medina knew— Why does he have to know it in advance as opposed to once they came into the car? I'm sorry, Your Honor. Why did he have to know it in advance as opposed to once they came into the car? I know you said that, but I couldn't quite understand why that would be. I think that's because of Rosemont, that under Rosemont an aider and abetter must have advanced knowledge of the specific and entire offense charged. And if he only learned that the individuals transported were illegal aliens at the moment that they entered the car, well, at that point, it's too late for him to do anything about it. He can't have been considered to have knowingly engaged in criminal activity when he agreed to accompany Rivera hours before the violence. Why couldn't he just leave? I don't understand that theory. I mean, I think you have stronger arguments, but why couldn't he just leave? Well, they were in a remote wilderness area. Well, I understand that, but conceptually, he could have gotten out of the car. I think that's just an unreasonable expectation. They were—I mean, the evidence is rife that they were in a—this was January on the Canadian border in Montana. I think you have a stronger argument that he didn't do anything. I mean, he sat in the car, and the evidence that he actually did any acts is that he was—that she wanted him to be there because she's a woman and in case the car broke down. That's right, Your Honor. But the car didn't break down, he didn't do anything, and he just didn't do anything. That's right. That's right. I agree 100 percent, Your Honor, that not only was the mens rea element not established, but the actus reus is not established either. The problem, counsel, is that this is subsequent to a conviction, so now the government gets every inference in its favor, and so I—let's assume that—let's go with your argument that the government has to prove that he knew at the outset or before the illegal aliens got into the vehicle. His story is just unbelievable, and so I think the jury could look at that and say, wait, I'm going to draw some inferences here. This is a woman that he's known for 20-plus years. I think he was the godparent to her child. He was going to go to Yakima at some point. The plan changed. He didn't ask any questions. They have to pull over to sleep. It's really an unbelievable story, and so we're going to basically draw an inference against him that he knew the whole time that he was going to be paid. He's there for protection. Why are those unreasonable inferences? I think there's just too much speculation involved at that point. I think that his story doesn't make sense when he's talking to Border Patrol, but I think the most that you can infer from that is that at that point, after the pickup had occurred, after the individuals had been identified in the back of the vehicle, and while he was in Border Patrol custody being questioned about this, that at that point, he realized that he was in trouble and he lied, but that is not sufficient. This Court has held that false exculpatory statements are weak circumstantial evidence because the innocent as well as the guilty may lie when I infer here, at that point, that Medina knew that he was in trouble. Sure. That's an argument for the jury. It's a weak case, and I think the district court definitely saw that. It's a very thin case, and I think that explains why counsel strategically wanted to send it to the jury rather than risk ending in a mistrial, but once the jury convicts, don't we have to assume that the jury reached those inferences, weak as they may be? You had a chance to argue that. Were you the trial counsel? I was co-counsel, yes, Your Honor. Weak as they may be, those are pretty good arguments during the defense closing, but once the jury rejects that, what are we to do with that, right? Because lying is consciousness of guilt. So, Your Honor, I think, yes, generally, we have to draw inferences in favor of the jury's determination, but there are limits to those inferences to make. There's limits to the deference that we give to a jury, and that's why this issue can be raised on appeal, is the insufficiency of the evidence. But I would also note that, to get back to the mens rea point, that the government's argue or the government's theory of mens rea below and on appeal was largely based on reckless disregard, and that is not the correct standard for an aider and abetter. Under Rosemont, the aider and abetter, it's not sufficient that they act with reckless disregard. They have to know in advance the specific and entire offense charge. So I think that that just simply wasn't met here, where you have, yes, the false statements, but that on its own is not enough. The circumstances of the pickup, the remote location and proximity to the Canadian border, those are not relevant to the question of whether he had advanced knowledge, because if you learn them at the location that he didn't have access to— He went to a remote portion of the border without asking any questions. I think there's an inference that can be drawn from that. I think that the most that can be inferred from that is that, at some point, some undetermined point, he may have suspected that something was not right, but that's not knowledge that the purpose of this trip was to transport a legal inference. They were going to— We know that even with knowledge—I mean, there are several cases of the guy who was in a trunk and the woman who knew that her father was using the birth certificate and importing a legal child and so on. The knowledge is not just positive. He still has to do something. So I'd like you to—I'm really quite mystified by why—your knowledge argument is not very strong, but the act argument seems to me to be stronger, and I'd like to hear that. Yes, Your Honor. So I would point to the two cases cited in the brief, Gonzales v. Mukasey and Altamirano v. Gonzales, where this court held that simply accompanying someone to transport illegal aliens, your presence in the vehicle, is not a sufficient affirmative act. Even in Altamirano, when you know that there was a crime being committed— But as I understand it, so the acts here are being there to protect her, I guess, which doesn't seem that different from being there to look like a normal family, but the other one is this kind of contingent, in case the car breaks down. Is that sufficient? I'm sorry, Your Honor, I— In case the car breaks down, the notion that he was also there in case the car broke down. So he was serving as a backup, you know, mechanic, so to speak. Is that an act that makes him— No, Your Honor. I think that goes to mens rea, but I don't think that doesn't—that goes to what his intention was in being there. Well, if he was hired, suppose he was—suppose we knew that he was—you know, somebody signed a document that you're coming along on this trip, knowing that there are going to be illegal aliens, just in case the car breaks down because you're a good mechanic, I'm going to pay you $500. I gather the notion is she didn't say she was going to pay him until later, but suppose she did say she was going to pay him or didn't say that. Would that be sufficient act? I don't think so, Your Honor. I think that the facts that you've just described are, in principle, indistinguishable from Gonzalez v. Mukasey, where the Respondent's father said, I'm going to transport two Mexican infants across the border. I would like to use your son's birth certificate, and it would be better if you came along for the ride. I think there's a clear implication there. Suppose somebody's going to rob a bank, and I'm going to go in and rob the bank, and I've got a getaway driver, but I want somebody else to sit in the car, and if anybody comes after us, you'll shoot them. And in fact, nobody does come after them, so he doesn't have to shoot anybody. So all he does is he's just sitting there. You think he's not an aider and abetter? Because there's no act? I think the government would need to establish that that person's participation somehow actually furthered the offense. And I don't think that there is any such evidence here that his presence in the vehicle actually materially assisted with the completion of the offense. But why isn't her statement that she was sort of concerned being a woman by herself for her safety, and she was concerned that the car might break down? And so having somebody there who was prepared to help her in both of those situations, like, made it easier for her to do this? Well, there's no—she didn't specifically testify that she would not have taken this trip without him. He did not render any acts that—any of those acts that she asked him to do. Well, he was there for protection. I'm sorry. I'm sorry. No, he was there for protection. I don't believe that there is any— He was going to be paid to be there for protection. And at one point, there was a plan that he was going to assist in the long drive as well, but he didn't have a license. I thought there was testimony to that effect. Rivera testified that he was supposed to drive at some point, but when she discovered that he didn't have a license— Right. So the plan was he was going to be paid to assist her in driving and to serve as protection because she was a woman and she was concerned about picking up strangers by herself, right? That's—those are favorable inferences for the government. I think, again, that those go to intent rather than affirmative acts, that where no such affirmative acts were ever taken, there was no real assistance. I see I'm out of time. Did she—let me just ask one question. Yes, Your Honor. She did say that she—the plan was for him to drive, which I assume meant that she—he—I don't know if she said that he knew that. Did she say that he knew or she told him or he understood that he was coming along for these reasons? She said— I don't remember. My recollection is that she simply said that she asked him to come along for the trip. At trial, she said, I wanted him there because— I understand. Did she say she told him that? She told him— Did she tell him that she wanted him there because she was a woman, because the car might I don't believe that she said specifically that she told him that. I think she said she told the jury that that was why she wanted him there, but I don't think that there's evidence that she told him that. Right. Thank you, counsel. Thank you, Your Honor. I'll give you a couple of minutes on rebuttal. You're facing a very hot bench today. May it please the Court, Tim Tatarka of the District of Montana on behalf of the United States Department of Justice. On record, page 433, Rivera does testify that she told Medina that she was—that she wanted him to come with him to travel to Montana to be there for—to repair a flat—deal with a blown tire or other car trouble. And jumping right into that point, the car trouble and the tire issue are really important here. It's important to realize that this was a dangerous situation. This was a prearranged meeting in the middle of nowhere on the Montana-Canadian border. You had immigrants coming across the border on foot in the snow. It was important that they got there when they did for purely the safety of the immigrants as well as the rest of the trip. And that is—so Medina's taking this trip with Rivera is—was a crucial part of the process of moving these immigrants, not just because of the protection, although that was an important point too, but because of this potential travel or potential deal with car issues, that sort of thing, as well as the fact that he was supposed to drive at some point. These acts, the act of taking a thousand-mile trip is much different than the act of being present at the—at a border crossing. The Alta Miranda case, the testimony there was specifically that the defendant was crossing the border anyway. She was merely present in the car at the border stop on a trip that she was already going on. Here, Medina was being paid for the purpose of going to this remote location, picking up these immigrants and transporting them back to Washington State. It's counsel—because you—it was not a very compelling case. You have a witness whose testimony got squishier as the trial went along to the point where the judge had to say this is a problem. I might have to reject her plea. So if we find, based on the evidence, that she didn't know until—by her own testimony, that she didn't know until after the other individuals got into the car, what does that do for this particular defendant's case? Do we expect him to jump out of the car at that point in the middle of nowhere? No. Taking the—so, to address the first part of your question, as Judge Christensen noted—and this is excerpts of the record, page 64—did note, the jury did not need to credit Rivera's statement that she didn't know until after they got into the car. That was implausible, as Judge Christensen said. Instead, the court can look at—or the court, taking the inferences in the light most favorable to the jury, can infer, as Judge Christensen did—and this is an excerpt from the record, page 53, and again at 66—that taking the inference as a whole, the jury could infer that he did know from the beginning. And looking at his own testimony— I don't recall. Did you affirmatively—were you the trial counsel in this case? I was not. Did your colleague affirmatively argue at closing that, hey, let's set aside her statement that she didn't know until after they got in the car? The government's theory is that she knew all along, and so, therefore, Medina knew all along. So the closing arguments are at the supplemental—we included them in the supplemental excerpts of the record. My recollection of that is, she didn't say—the first part of what you did say—that the inference there, you can infer Medina's knowledge— That Medina knew from the outset. And again, I would look at his own testimony. This is an excerpt from the record, 458, where he said he was—Rivera told him that he was going to make this trip as a way to make money. After they didn't go to Yakima, there was no questions and no discussions on the drive to Eureka. Then they go from Eureka to an unfamiliar wooded area. Again, no questions and no discussions. And then finally, when multiple individuals were coming out of the woods, he didn't ask who they were, didn't ask why they were there. That is corroborated by the immigrant's testimony. All of the immigrants testified and said that there were no questions or any concern from Mr. Medina. There just simply is—so, as Judge Christensen said—this is at 66 in the record—you're right. This is not the case of the century. But there is a strong circumstantial case here. It isn't the way the government intended this—intended the evidence to come in. But given the jury's verdict and the standard of sufficiency of the evidence, there is certainly sufficient evidence here to affirm. Sorry, I thought you were going to— When you—the closing argument said there was a paid passenger. Did Rivera, I thought, said that he—she didn't say he should—tell him he was going to give her money until he was in the car. Is that right? No, no. That was—and again, this would be at 458 of the—his statement at 458 of the record was that the text messages before the trip would show— But I thought there really weren't any text messages. The text messages aren't in the record. His testimony that there were text exchange—or not his testimony, excuse me—but his statement to Border Patrol that there were such text messages were—that is in the record. And again, I believe it's 458. That, of course, corroborates Rivera's story. I believe that's at 132, somewhere around there, where—132 133, where she does say that she offered to gift him was the language she used, but of course the jury could infer that this was payment for the trip. If there are no further questions— Can you address the confrontation clause issue for a moment? Sure. When the district court said that if she went much further along that path of denying culpability that he would have to consider vacating her plea and then declaring a mistrial, why did there have to be a mistrial in the case? Couldn't they have been tried separately? Well, the reason why there would have to be a mistrial would be she testified in Medina's case that she had pled guilty. So if the court—the court knowing—so if the court felt he had to reject that plea, the court would have had to—couldn't leave that testimony to stand and would have to— Why is that? I was sort of mystified by that, too. I didn't understand why there had to be a mistrial. I mean, he didn't have to reject it at that minute. He could have rejected it at the end of the trial. Oh. But why—why would that necessitate a mistrial? Oh. And, well, so, again, the court's explanation of this is at 64 and 65. But I think we would definitely be standing here—if we had convicted—if the court knew he was going to have to—he was going to not accept her plea agreement, go back on his acceptance of her plea agreement— The defendant would have an argument that her testimony was undermined by the fact that she did not actually plead guilty, and, therefore, what was supposed to be making her testimony credible, which is that she pled guilty, would be undermined. Yeah. Well, even more than that, her testimony at trial was generally favorable to Medina, and it was—it was itself prejudiced by the fact that she—I mean, think about how much anything would have been if that—it wasn't preceded by the notion that she had pled guilty to the crime. So Medina was prejudiced sort of already by the fact that she had pled guilty. So if, as Judge Christensen said, if she was now cloaked again in the presumption of innocence, then this trial would look much different if she had given the same testimony. I'm not sure which way that cuts. That's why I was a little bit thrown by just the immediate assumption that it would proceed to mistrial, right? Because her testimony was looking pretty good. Now, hindsight is perfect, but at that time, it was looking pretty good for Mr. Medina, maybe better than if they were tried together as co-conspirators, and then she doesn't testify at all. Well, and in fact, I think—so, I want to close the loop on this, that there—that we think this is unreviewable, because there was no objection and no request for clarification, even though the court had made itself available to that. So we don't think this is reviewable, but— I wondered about that. I mean, this is what he said, what we were going to object to. What was the objection going to be? So, for a—his—so, if you consider this sort of a preliminary ruling, then a preliminary ruling is only—you can only challenge that if it was express and definite, is the language this court has used—explicit and definite, I guess. And this was nothing. He said nothing more than, if I have to call a—be careful, because if she goes back on her testimony, I have to call a mistrial. That exists whether he gives a warning or not. The last point I want to make, if I may, Your Honor— Go ahead. But wait. So, I don't understand your point about the objection. What were they supposed to object to? Well, he—there was no restriction on what he could—what the defense could ask. There was no express or definite that— Right. No. No, there was no restriction. He didn't say that. He said, essentially, what he said. So, there was nothing to object to. And there was no restriction, so there's no Sixth Amendment issue. And that is our primary argument. Our primary argument is there's no Sixth Amendment issue at all. If there's a claim that there was, then it wasn't preserved. Again, sorry, that last point on that was the other important reason for that warning is so that the government— Because things weren't going well for the government. He does have a Fifth Amendment right for the government not to cause a mistrial. And so, that warning—and I think any fair look at that—that warning was primarily to the government on redirect. Don't go down this road any further and risk a mistrial, or you might be violating his Fifth Amendment rights. All right. Thank you very much, Your Honor. Thank you. So, Your Honor, I'd like to touch on the confrontation issue, that the Court's admonishment was perfectly clear that if Rivera, if he got a feeling that Rivera's plea was anything other than an unqualified admission of guilt, that the Court would declare a mistrial. But it was clear from her testimony at trial, as well as her statements at her change of plea hearing the morning before, that her plea was qualified. She had maintained the entire time that she didn't know that these individuals that she had been hired to pick up were illegal aliens. And so, any questioning about the circumstances of her plea, the basis for her plea, would have led to further equivocation on her part and a mistrial. But you did—or her attorney did ask whether she had told him that they were picking up illegal aliens, and she said no, which is essentially what you're now pointing to as what had to be established. And it was established. So what else was there? Delving into her plea, you know, did she truly know that these people were illegal aliens? Was or did she— Well, the question then is, would they—if what Judge Christensen eventually said was, whether I had said that or not, I would have had to declare a mistrial if this had gone down that road. And so it was fair to tell the lawyer so they were aware of it. But that he wasn't telling you not to do it. He was telling you that at some point there would be a mistrial problem. That is what he was saying, and I think that shows, one, why there was—any objection would have been futile, because the court was determined that a mistrial would result. But there simply was no basis for a mistrial. And so that's the question. Was there a basis for a mistrial? No, there was not. If Rivera had said, you know what, I'm not actually guilty. I took a plea offer because my attorney told me that this was the best chance I had to avoid deportation, but the truth of the matter is I had no idea what I'd gotten myself into. That's a win for Medina, and he should have had the opportunity to explore that with her. And there's no reason—the court was concerned. And at that point, if the court was, as your opponent suggests, concerned that there would be a challenge by Medina to any conviction on the ground that there should have been a mistrial, I suppose there could have been a conversation about that at that point. I mean, in other words, he could have asked you, do you want a mistrial? And you could have said, no, I don't want a mistrial. Perhaps. I mean, we could speculate about how things might have played out and what arguments might have been there to be made, but I think the fact of the matter is that Medina should have— The problem was inherent in the situation, and he didn't tell you not to do it. And it was quite obvious that the admonition was directed at the government because only the government had done anything along these lines. Well, it didn't feel that way in the courtroom. He had told the government during the direct, you know, stop asking that question, but then there was more questioning, and then the jury was excused, and then this came to the admonishment, and it was to the whole courtroom. And the concern was not with what evidence was going to come in. It was with Rivera's plea unraveling. And there's just no reason why that should have had anything to do with Medina's right to a trial. The purpose of the trial was to seek the truth of whether he was guilty or not. And whether she had entered an improvident plea the morning before and was now recanting, that had nothing to do with the procedural regularity of Medina's trial. He should have had the opportunity to ask the question. One other possible problem that might have required a mistrial is that at that point, she had now testified against herself to a certain degree, and she had compromised her own Fifth Amendment rights if she were not, in fact, considered to be guilty. That would have been a difficult problem to untangle with Rivera and her counsel, but I don't think it had any – there was no reason why it should have impacted Medina's trial. All right. Thank you very much, counsel, for both sides for your argument in this case. The matter is submitted. We'll take a very brief break before hearing argument in the last two cases.
judges: BERZON, NGUYEN, MILLER